UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MARGO CARRIS,

                          Plaintiff,                    5:13-CV-0923
                                                       (GTS/ATB)
v.

FIRST STUDENT, INC.,

                          Defendant.
_____

APPEARANCES:                                   OF COUNSEL:

MARGO CARRIS
  Plaintiff, *Pro Se*
217 W. Lafayette Ave.
Syracuse, New York 13205

LITTLER MENDELSON, P.C.                         IVAN R. NOVICH, ESQ.
  Counsel for Defendant                         JESSICA F. PIZZUTELLI, ESQ.
One Newark Center, 8th Floor
Newark, New Jersey 07102

GLENN T. SUDDABY, Chief United States District Judge

## DECISION and ORDER

Currently before the Court, in this *pro se* employment discrimination action filed by

Margo Carris ("Plaintiff") against First Student, Inc. ("Defendant"), is Defendant's motion for

summary judgment.  (Dkt. No. 51.)  For the reasons set forth below, Defendant's motion is

granted.

## I.    RELEVANT BACKGROUND

### A.    Plaintiff's Complaint

Generally, liberally construed, Plaintiff's Complaint alleges that, between approximately

October 10, 2012, and October 15, 2012, in Syracuse, New York, Defendant violated her rights

by terminating her employment based on her race. (Dkt. No. 1.) Plaintiff alleges that Defendant did not treat her equally to her white co-workers in comparable cases of employee misconduct. (*Id*.) Based on these factual allegations, Plaintiff asserts a claim that she was treated in a disparate manner, and was subjected to racially based discriminatory employment practices by her employer, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. ("Title VII") (*Id*.) Familiarity with the factual allegations supporting this claim in Plaintiff's Complaint is assumed in this Decision and Order, which is intended primarily for review by the parties.

### B.     Undisputed Material Facts

Unless otherwise noted, the following facts were asserted and supported with accurate record citations by Defendant in its Statement of Material Facts and either expressly admitted or denied without appropriate record citations by Plaintiff in her response thereto. (*Compare* Dkt. No. 51, Attach. 36 [Def.'s Rule 7.1 Statement] *with* Dkt. No. 53 [Plf.'s "Answer" to Def.'s Motion].)

### 1.     First Student's Business

1.     First Student provides student passenger transportation services across the United States and Canada.

2.     First Student contracts with school districts to transport children to school.

3.     First Student has a location at 300 Spencer Street, in Syracuse, New York, which is where Plaintiff worked as a bus driver ("Spencer Street location").

4.     Tyrone Worrell is the Location Manager for the Spencer Street location.

5.     Worrell is African-American.

6.      In October 2012, approximately one-third of the employees at the Spencer Street location were African-American.

7.      Lynea Lemke was Plaintiff's supervisor at the Spencer Street location.

8.      At the Spencer Street location, First Student has one main client, the Syracuse City School District ("SCSD").

9.      SCSD has been a client of First Student since 2006, and is virtually the sole source of revenue for First Student at the Spencer Street location.

10.      In October 2012, First Student serviced only two school districts at the Spencer Street location: SCSD and Lyncourt School District ("Lyncourt").

11.      First Student drove approximately 125 bus routes for SCSD, and only six routes for Lyncourt.

12.      Approximately 98% of First Student's revenue at the Spencer Street location came from SCSD.

13.      The remaining approximately 2% of First Student revenue derived from chartered bus rentals, and the six routes for Lyncourt.

14.      The Lyncourt routes are desirable bus routes, which the bus drivers have to bid on per the collective bargaining agreement, and are typically driven by bus drivers with the greatest seniority.

15.      Plaintiff drove SCSD bus routes.

16.      Only "rare[ly]" would Plaintiff drive a route that was not for SCSD.

17.      Plaintiff drove a non-SCSD route on only a "few" occasions.

### 2. Collective Bargaining Agreement

18.     In October 2012, the assignment of routes and charter work was governed by the Collective Bargaining Agreement between Teamsters, Chauffers, Warehousemen, & Helpers Local Union # 182 (Plaintiff's former union) and First Student, Inc. (the "Collective Bargaining Agreement").[1]

19.     According to the Collective Bargaining Agreement, bus drivers must bid on bus routes on a seniority basis.[2]

20. Charter work is assigned according to seniority-based procedures in the Collective Bargaining Agreement.

21.     According to Worrell, per the Collective Bargaining Agreement, First Student cannot unilaterally permanently assign (or reassign) a bus driver to a specific bus route (including a non-SCSD route) or charter work, or "bump" a driver from their route and replace them with a different driver.

### 3. First Student's Non-Discrimination and Student Confidentiality Policies

22.     First Student has an "Equal Opportunity Employer" policy that prohibits discrimination, and provides that all terms and conditions of employment must be administered without regard to race, color or any other consideration made unlawful by federal, state, or local laws.

---

[1]     Although the Defendant improperly provided only a general cite to Exhibit A to the Worrell Declaration, the Court notes that the above factual assertion is supported by Dkt. No. 51, Attach. 2, Article 8, Section 4 and Article 9, Section 1.

[2]     *See*, *supra*, footnote 2 of this Decision and Order.

23. First Student also has a "Student Confidentiality" policy, which provides that "[a]ny information regarding the child MUST be kept confidential," and "First Student employees must not disclose any information other than with school officials or their supervisor regarding a student, whether they are disabled or not, that may be used to identify a student."

24. First Student's "Student Confidentiality" policy protects information that includes "the student's personal information and any other information related to the student."

25. First Student has a "Student Confidentiality" policy that purports to be required by the Family Education Rights & Privacy Act ("FERPA").

26. Plaintiff received a copy of these policies, and understood that she was expected to read, understand and adhere to them.

27. Plaintiff understood that it was part of her responsibility as an employee to comply with the policies and procedures in First Student's Employee Handbook.

28. Plaintiff did not read the Student Confidentiality policy until after her employment was terminated.

29. First Student also trained employees regarding student confidentiality.

30. Plaintiff was trained regarding First Student's Student Confidentiality policy, and specifically not to discuss a child with anyone other than school officials.

### 4. Plaintiff's Employment at First Student

31. Plaintiff, an African-American woman, was hired by First Student on May 10, 2007, as a bus driver at the Spencer Street location.

32. While Plaintiff was employed by First Student, Defendant increased her pay by over $10 per hour, from $10.50 per hour to $20.70 per hour, knowing she is African-American.

33. Before the termination of her employment, Plaintiff believed that she was treated fairly by First Student, and never felt that she was discriminated against.

34. Plaintiff testified at deposition that her job at First Student was "the best job [she] ever had."

35. A racial comment or remark had never been made to Plaintiff in the workplace at First Student.

36. Throughout the course of her employment, Plaintiff drove bus routes for the SCSD.

37. Lemke was Plaintiff's supervisor, and Lemke reported to Worrell.

**5. Plaintiff's Employment Was Not Terminated for Child Safety Violations, and Plaintiff Was Given Multiple Opportunities to Improve Her Performance**

38. On January 20, 2011, Plaintiff received a written warning for getting into a preventable accident, which occurred while children were on the school bus.

39. Despite this preventable accident, Plaintiff's employment was not terminated, and First Student gave her an opportunity to improve.

40. On July 25, 2011, Plaintiff received a verbal warning for not properly crossing a child across a street before the student boarded the school bus.

41. If a child is not properly crossing the street or looking both ways before they cross the street it is a "child safety concern."

42. First Student did not terminate Plaintiff's employment for not properly crossing a child, but again provided her with an opportunity to improve. Plaintiff testified at deposition that "[i]t made me a better driver, you better believe."

**6. Events Leading Up to the Termination of Plaintiff's Employment**

43. On October 10, 2012, a male child on Plaintiff's bus "was kicking, punching, slapping, and spitting on the other younger students."

44. Although Plaintiff asked the child to sit down and to "keep his hands and feet to himself," he refused and also indicated that he "d[idn't] care" if Plaintiff wrote a referral concerning his behavior on the bus.

45. A "referral" is when bus driver writes a report about a child's behavior on the school bus, which is then provided to the school district for handling.

46. It is First Student's policy that, if a child is misbehaving on a school bus, the bus driver must write a referral.

47. On the last stop of her route where the male child exited the bus, Plaintiff identified the male child as a playmate of her grandson.

48. After leaving work, instead of writing a referral to report the male child's behavior (per First Student policy), Plaintiff instead "decided to go to the male student's house to inform his guardian(s) of his behavior on the bus."

49. Plaintiff had never met the male child's guardian–his grandmother–before.

50. Plaintiff's daughter, a non-First Student employee, accompanied Plaintiff to the male child's home.

51. Upon arriving at the male child's home, and while wearing her neon First Student vest, Plaintiff spoke with a young woman who Plaintiff knew was not the male child's grandmother.

52.     The young woman informed Plaintiff that the male child's grandmother was not home.

53.     Plaintiff told the young woman that when her grandmother came home, she needed to "tell her that . . . [the male child] was bad on the school bus."

54.     Plaintiff told the young woman that the male child was spitting on other children, and punched another student in the stomach.

55.     During this entire interaction, Plaintiff's daughter, who was 25 years old at the time, was in a truck parked 8-9 feet away from the front door, and visible from the front door as it was still daylight.

56.     The male child's grandmother complained to SCSD about Plaintiff, stating that Plaintiff went to her home with another parent and threatened her and her grandson.

57.     SCSD contacted First Student about the grandmother's complaint.

58.     On October 11, 2012, Lemke met with Plaintiff to investigate the grandmother's allegation.

59.     During that meeting, Plaintiff admitted that she went to the child's home after hours, with another adult (her daughter, who was not a First Student employee), and admitted that she spoke to the young woman about the child's behavior on the bus.

60.     First Student also obtained Plaintiff's written statement about the incident.

61.     In Plaintiff's written statement, she admits that she went to a child's house, that the child's grandmother was not home, and she asked a "female between the age of 18-20 years old to tell [the child's] grandmother that [the child] was spitting on other students" and that he punched a student in the stomach.

62.    On October 15, 2012, SCSD sent a letter to Plaintiff's boss, Worrell, stating that Plaintiff was removed from all of its bus routes, effective immediately.

63.    The October 15, 2012 letter stated as follows: "Due to an incident on October 10, 2012, the above-named bus driver is removed from all SCSD bus routes effective immediately."

64.    This had the effect of rendering Plaintiff ineligible to drive on any routes for the one main client of the Spencer Street location, SCSD.

65.    Since Worrell has been employed by First Student, First Student has never employed a bus driver after SCSD removed that bus driver from its bus routes.

**7.    Plaintiff's Employment Was Terminated**

66.    As a result of Plaintiff's admission that she had gone to a child's home with another adult to confront the child's guardian about his conduct, and had conveyed confidential information about that child to someone other than her supervisor (or the child's guardian), which had resulted in her removal from all SCSD routes, Worrell made the decision to terminate Plaintiff's employment effective October 15, 2012.

67.    Plaintiff's conduct was a violation of First Student's "Student Confidentiality" policy. Specifically, it was a violation for Plaintiff to disclose to her daughter (a non-First Student employee) a child's home address. In addition, it was a violation for Plaintiff to disclose to the young woman any information about the child's behavior on the bus.

**8.    No Similarly Situated Driver Was Treated Better Than Was Plaintiff**

68.    There is no other First Student employee who went to a child's home after hours with another adult, confronted a person at the child's home about the child's conduct on the bus, and was removed from driving for First Student's customer, SCSD, but nevertheless continued to be employed by First Student.

69.     Plaintiff cannot identify any other employee who went to a child's home after hours, and whose conduct was brought to the attention of First Student.

70.     Plaintiff cannot identify any employee who violated First Student's "Student Confidentiality" policy.

71.     Since Worrell has been employed by First Student, the company has never continued to employ a bus driver removed by SCSD from its bus routes.

72.     Plaintiff cannot identify any other bus driver of First Student who was removed from all SCSD bus routes and remained employed by the company.

73.     When SCSD requested that a white male bus driver, Gary, be removed from its bus routes, First Student terminated his employment.

74.     Worrell has terminated the employment of other bus drivers for serious policy violations and serious misconduct regardless of their race or any other protected characteristic.

75.     On October 17, 2012, Worrell terminated the employment of Mark, a white bus driver, for a serious policy violation.

76.     On October 30, 2012, Worrell terminated the employment of Michelle, a white bus driver, for a serious policy violation.

77.     On October 17, 2012, Worrell terminated the employment of Ricky, a white bus driver, for a serious policy violation.

**9.      Plaintiff's Alleged Comparators Are Not Similarly Situated to Her**

**a.      Sleeping Child Procedure and Progressive Discipline Policy**

78.     Plaintiff identifies two alleged comparators–Cathy and Alice–who allegedly violated First Student's Sleeping Child Inspection Procedure, but were not terminated.

10

79.     The Sleeping Child Inspection Procedure requires bus drivers to check the bus after the last stop of their route to make sure that a child is not left on the bus.

80.     Failure to follow the Sleeping Child Inspection Procedure does not necessarily mean that a child's safety is put in jeopardy.

81.     Typically, if a driver does not perform the Sleeping Child Inspection Procedure, they will not identify a sleeping child on their bus until they return to the bus yard and additional child safety checks are performed.

82.     First Student has a progressive discipline policy, which is contained in the Employee Handbook, for when an employee does not follow the Sleeping Child Inspection Procedure. The progressive discipline policy does not necessarily provide for termination upon the first offense.

83.     If a child's safety is not put in jeopardy, First Student will follow the progressive discipline policy for Sleeping Child Inspection Procedure violations.

84.     If, however, there is a serious violation which results in a child's safety being put in jeopardy, a bus driver's employment will be terminated even for a first offense. This is consistent with First Student's progressive discipline policy.

85.     A Caucasian male employee's employment was terminated for a sleeping child violation.

### b.     Alice

86.     Plaintiff claims that Alice violated First Student's Sleeping Child Inspection Procedure, but her employment was not terminated.

87.     Plaintiff has no personal knowledge concerning Alice's alleged violation of First Student's Sleeping Child Inspection Procedure.

88.     Plaintiff did not work in the human resources department and was not involved with disciplining other employees.

89.     Plaintiff does not claim that Alice put a child's safety at risk.

90.     Plaintiff does not claim that Alice was the subject of a parent complaint to SCSD due to this alleged incident.

91.     According to Plaintiff, Alice, who is white, was later the subject of a parent complaint for inappropriate conduct and her employment was terminated.

92.     Alice was not removed by SCSD from its bus routes and thereafter continued to be employed by First Student.

### c.     Cathy

93.     Plaintiff claims that Cathy violated First Student's sleeping child procedure, but her employment was not terminated.

94.     Plaintiff has no personal knowledge of Cathy's personnel file or disciplinary history.

95.     Plaintiff does not claim that Cathy put a child's safety at risk.

96.     According to Plaintiff, Cathy's monitor, Leonard Baxter, told Cathy that he performed the sleeping child check, when he in fact failed to do so. It is common practice for only the monitor to perform the sleeping child check.

97.     Plaintiff does not claim that Cathy was the subject of a parent complaint to SCSD due to this alleged incident.

98.     Cathy was not removed by SCSD from its bus routes and thereafter continued to be employed by First Student.

99.     Leonard Baxter was not, and never has been, a First Student employee. As a result, First Student did not terminate his employment.

### d.     Gary

100.     Plaintiff claims that Gary dropped a child off at an unauthorized stop, and that First Student terminated his employment, but that he filed a grievance with the union and was reinstated.

101.     Plaintiff did not file a grievance with the union after her employment was terminated.

102.     According to Plaintiff, Gary believed that he dropped the child off at the correct stop.

103.     Prior to Plaintiff filing her Complaint, SCSD never requested that Gary be removed from its bus routes.

104.     In 2015, Gary's employment was terminated when he left a child at an unauthorized stop and the SCSD requested that he be removed from its bus routes.

105.     Other than Alice, Cathy, and Gary, Plaintiff does not claim that any other First Student employee was treated better than she.

### 10.     No Probable Cause Finding and Federal Complaint

106.     On or around October 31, 2012, Plaintiff filed a Complaint with the New York State Division of Human Rights, alleging that her employment was terminated because of her race.

107.     The Division investigated Plaintiff's allegations and, on or around April 23, 2013, issued a Determination and Order after Investigation, finding that there was no probable cause to believe that any discrimination occurred.

108. The Division concluded that there was no comparably situated driver identified by Plaintiff of a different race/color who was accused of a similar offense as Plaintiff and who was treated more favorably than she.

109. Plaintiff commenced this action on August 5, 2013, by filing a Complaint (Dkt. No. 1), alleging that First Student discriminated against her in violation of Title VII and the New York Executive Law § 296, on the basis of her race (African-American), by terminating her employment.

110. The only claim remaining in this case is Plaintiff's Title VII race discrimination claim.

### C. Briefing on Defendant's Motion

#### 1. Defendant's Memorandum of Law

Generally, liberally construed, Defendant's motion for summary judgment asserts the following three arguments. (Dkt. No. 51, Attach. 37 [Def.'s Memo. of Law].)

First, Defendant argues that, even assuming Plaintiff can prove that she was subject to an adverse employment decision, she has failed to establish that the decision was made under circumstances giving rise to an inference of discrimination, which is necessary to demonstrate a *prima facie* discrimination claim. (*Id.* at 16.) Specifically, Defendant argues that Plaintiff has failed to establish that the decision was made under such circumstances for the following five reasons: (a) simply accusing others of racial prejudice is insufficient to raise a material issue of fact without evidence that the adverse employment decision was made under circumstances giving rise to an inference of unlawful discrimination; (b) Plaintiff has offered no direct evidence of race discrimination; (c) the decision-maker for her termination was of the same protected

class; (d) the racial makeup of Defendant's Spencer Street location, where Plaintiff was employed, undercuts any possible inference of discrimination, where approximately one-third of the employees were of the same protected class as Plaintiff; and (e) Plaintiff has offered no evidence whatsoever that a similarly-situated employee outside of Plaintiff's protected category was treated more favorably than she. (*Id.* at 16-20.)

In support of its assertion that Plaintiff has offered no evidence that a similarly situated employee was treated more favorably, Defendant submits that Plaintiff provided no evidence of her alleged comparators disciplinary records and that Plaintiff's examples for a similarly situated employee were not comparable. (*Id.* at 18.) Specifically, Defendant argues that the three alleged situations of the comparators were not comparable because, unlike Plaintiff, none of them involved the following: (a) a request from Syracuse City School District ("SCSD") that the employee be removed from all of its bus routes, except for one employee who was also terminated upon receipt of said request; (b) a violation of Defendant's Student Confidentiality Policy ("Confidentiality Policy"); (c) intentional conduct; and (d) conduct that led to a parental complaint. (*Id.* at 18-19.)

Second, Defendant argues that, even if Plaintiff can meet her *prima facie* burden, Defendant had a legitimate, non-discriminatory reason for its decision to terminate her employment. (*Id.* at 20.) Specifically, Defendant argues that the decision to terminate Plaintiff was made for the following two reasons: (a) Plaintiff engaged in conduct that violated the Confidentiality Policy; and (b) that this conduct caused SCSD to remove Plaintiff from all SCSD routes. (*Id.* at 21.) Defendant argues that removal from all SCSD routes essentially rendered her unemployable by Defendant, because SCSD routes make up 95% of bus routes at Defendant's

Spencer Street location and the collective bargaining agreement prevented her reassignment to a non-SCSD route. (*Id.* at 18, 21.) Further, Defendant argues that it met its burden of production by introducing admissible evidence that discrimination was not the cause of the decision to terminate Plaintiff's employment. (*Id.* at 20.) Defendant argues that it met its burden of production because these facts are undisputed and constitute legitimate, non-discriminatory reasons to terminate Plaintiff's employment "as a matter of law and common sense." (*Id.* at 21.)

Third, Defendant argues that Plaintiff has provided no evidence to show that Defendant's legitimate business reasons for its decision were a pretext for race discrimination. (*Id.* at 22.) Defendant argues that Plaintiff cannot prove pretext for the following five reasons: (a) Plaintiff readily admits to engaging in the conduct for which she was terminated; (b) Plaintiff readily admits that this conduct violated Defendant's Confidentiality Policy; (c) Plaintiff does not dispute that SCSD requested that she be removed from all of its bus routes; (d) having admitted that she engaged in the conduct for which she was terminated, and that this conduct was a violation of the Confidentiality Policy, she cannot establish that the reasons for her termination were false; and (e) for the reasons set forth above, Plaintiff cannot show that anyone outside of her protected class was treated more favorably than she. (*Id.* at 22-23.)

### 2. Plaintiff's Non-Response

On the date on which Plaintiff's response to Defendant's motion was due (i.e., March 19, 2018), she requested a fifty-nine-day extension of the response deadline (i.e., to May 17, 2018). (Dkt. No. 52.) Out of special solicitude to Plaintiff as a *pro se* civil rights litigant, the Court granted her a sixty-three-day extension of the response deadline (i.e., to May 21, 2018). (Text Order filed March 20, 2018.) However, the Court expressly warned her that "THIS IS A FINAL

EXTENSION. DUE TO THE AGE OF THIS CASE, NO FURTHER EXTENSIONS WILL BE GRANTED." (*Id.* [capitalization in original].)

Plaintiff did not file her response on or before the new date on which Plaintiff's response to Defendant's motion was due (i.e., May 21, 2018). (*See generally* Docket Sheet.) Rather, seventeen days after that new date (i.e., on June 7, 2018), Plaintiff filed a letter informing the Court that, on the next day (i.e., June 8, 2018), Plaintiff would be filing her response. (Dkt. No. 53.) However, Plaintiff did not file her response on June 8, 2018. (*See generally* Docket Sheet.)

Four days later (on June 12, 2008), the Court began work on deciding Defendant's motion for summary judgment. Forty-three days later (i.e., on July 25, 2018), as the Court's Decision and Order was being finalized, Plaintiff notified the Court that she would be filing her response on July 30, 2018 (implicitly requesting, belatedly, a second extension despite the Court's prior warning than no second extensions would be granted). (Dkt. No. 54.)

Five days later (i.e., on July 30, 2018), Defendants filed a letter-motion requesting that the Court deny Plaintiff leave to file her response on July 30, 2018 (which would be one hundred and thirty-three days after the original response date of March 19, 2018). (Dkt. No. 55.)[3] The next day (i.e., on July 31, 2018), when the Court discovered that Plaintiff had not in fact filed her response on July 30, 2018, the Court granted Defendant's letter-motion. (Text Order filed July 31, 2018.)

To reasons stated in the Court's Text Order of July 31, 2018, the Court would add only three points in support of its decision to grant Defendant's letter-motion: (1) this case is nearly

---

[3] The Court notes that, because Defendant's letter-motion was served on Plaintiff by mail instead of electronically, there was no way that she could have believed that Defendant's letter-motion stayed her request for leave to file her response on July 30, 2018.

five years old, and Plaintiff has had more than adequate opportunity to conduct discovery and

oppose Defendant's motion for summary judgment; (2) had the Court granted yet a *third*

extension of the response-filing deadline, no reason exists for the Court to believe that she would

have met that deadline; and (3) Plaintiff was given specific notice of the consequences of failing

to respond to a summary judgment motion (Dkt. No. 51, Attach. 38).

## II.      RELEVANT LEGAL STANDARDS

### A.      Standard Governing a Motion for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that

there is no genuine dispute as to any material fact and that the movant is entitled to a judgment

as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence

is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).[4] As for the materiality requirement, a dispute of fact is

"material" if it "might affect the outcome of the suit under the governing law . . . . Factual

disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all

ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In

addition, "[the movant] bears the initial responsibility of informing the district court of the basis

for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s]

the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24

---

[4]      As a result, "[c]onclusory allegations, conjecture and speculation . . . are
insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d, 400 (2d Cir.
1998) [citation omitted]. As the Supreme Court has explained, "[The non-movant] must do more
than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*
*Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

(1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e).

Implied in the above stated burden-shifting standard is the fact that, where a non-movant fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute–even if that non-movant is *pro se*. *Cusamano v. Sobek*, 704 F. Supp.2d 416, 426 & n.2 (N.D.N.Y 2009) (Suddaby, J.) (citing cases). (This is because the Court extends special solicitude to the *pro se* litigant largely by enduring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.) *Id.* at 426 & n.3 (citing cases). As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules. *Id.* at 426-7 & n.4 (citing cases). Of course, when a non-movant fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the motion does is lighten the movant's burden. *Matlock-Abdullah v. New York State Dep't of Labor*, 15-CV-0294, 2017 WL 5905564, at *7 (N.D.N.Y. Nov. 29, 2017).

For these reasons, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported

by evidence in the record, and (2) the non-movant has failed to properly respond to that statement[5]–even where the non-movant was proceeding *pro se*. *Id.*, at \*8 (N.D.N.Y. Nov. 29, 2017) (citing *Cusamano*, 604 F. Supp.2d at 427 & n.6 [citing cases]).

Similarly, in this District, where a non-movant has failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3).[6] *Matlock-Abdullah*, 2017 WL 5905564 at \*8. Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *Id.*, at \*8 (N.D.N.Y. Nov. 29, 2017); *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at \*1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at \*2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

---

[5]     Among other things, Local Rule 7.2(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L.R. 7.1(a)(3).

[6]     *See, e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at \*27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at \*3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to the "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

**B.      Standard Governing a Title VII Discrimination Claim**

Under Title VII, it is "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Daniel v. AutoZone, Inc.*, 13-CV-0118, 2015 WL 2114158, at *2 (N.D.N.Y. May 6, 2015) (Sharpe, C.J.) (quoting 42 U.S.C. § 2000e-2[a][1]). Plaintiff's "Title VII discrimination claim is governed by *McDonnell Douglas*." *Dooley v. JetBlue Airways Corp.*, 636 F. App'x 16, 19-20 (2d Cir. 2015) (citing *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 73-74 [2d Cir. 2015]). The *McDonnell Douglas* test is a burden shifting approach with a three-step analysis for Title VII discrimination claims.

As to the first step of this analysis, "[the plaintiff] bears the burden of establishing a prima facie case of discrimination by showing [the following:] (1) [s]he belonged to a protected class; (2) [s]he was qualified for the position [s]he held; (3) [s]he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Tolbert v. Smith*, 790 F.3d 427, 435 (2d Cir. 2015) (internal quotation marks omitted). If the plaintiff can prove all four elements, the second step is triggered, which shifts the burden of production to the defendant. *Woodman v. WWOR-TV, Inc*., 411 F.3d 69, 76 (2d Cir. 2005) ("A plaintiff's establishment of a prima facie case gives rise to a presumption of unlawful discrimination that shifts the burden of production to the defendant, who must proffer a legitimate, non-discriminatory reason for the challenged employment action.").

If the defendant comes forward with a legitimate, non-discriminatory reason for the challenged employment action, the presumption of discrimination drops out of the analysis, and the defendant "will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *Daniel*, 2015 WL 2114158, at *3 (quoting *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000). Therefore, if the defendants offer a legitimate, non-discriminatory reason for the adverse employment action at issue, the burden then shifts back to Plaintiff for the third step of the *McDonnell Douglas* analysis.

Once the burden shifts back to the plaintiff, she must show, "without the benefit of the presumption, that the employer's determination was in fact the result of racial discrimination." *Daniel*, 2015 WL 2114158, at *3 (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 [2d Cir. 2008]). The plaintiff must demonstrate "by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Daniel*, 2015 WL 2114158, at *3 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 [1981]). As further explained by the Supreme Court, to demonstrate pretext, a plaintiff must show "both that the [employer's offered] reason was false, and that discrimination was the real reason." *Daniel*, 2015 WL 2114158, at *3 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 [1993]); *see also Fisher v. Vassar Coll.*, 70 F.3d 1420, 1433 (2d Cir. 1995). Moreover, conclusory allegations of discrimination are insufficient to defeat a motion for summary judgment. *Daniel*, 2015 WL 2114158, at *3 (citing *Holcomb*, 521 F.3d at 137; *Schwapp v. Town of Avon*, 118 F.3d 106, 110 [2d Cir.1997]).

## III.    ANALYSIS

Defendant concedes, for purposes of this motion, that Plaintiff has satisfied the first three elements in the first step of the *McDonnell Douglas* test.  As a result, the Court will begin its analysis by discussing the fourth element of the first step of the *McDonnell Douglas* test; then the Court will discuss the second and third steps of the *McDonnell Douglas* test.

### A.    Whether the Adverse Employment Action Suffered by Plaintiff Occurred Under Circumstances Giving Rise to an Inference of Discriminatory Intent

After carefully considering the matter, the Court answers this question in the negative for the reasons stated by Defendant in its memorandum of law. *See*, *supra*, Part I.C. of this Decision and Order. To those reasons, the Court adds the following analysis.

Plaintiff primarily argues that she was subjected to disparate treatment when she was terminated by First Student. "'A showing of disparate treatment–that is, a showing that the employer treated plaintiff less favorably than a similarly situated employee outside his protected group–is a recognized method of raising an inference of discrimination for purposes of making out a prima facie case.'" *Seale v. Madison Cty.*, 929 F. Supp. 2d 51, 67 (N.D.N.Y. 2013) (Suddaby, J.) (quoting *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 [2d Cir. 2003]). "A plaintiff relying on disparate treatment evidence 'must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.'" *Mandell*, 316 F.3d at 379 (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 [2d Cir. 2000]); *accord*, *Shumway v. United Parcel Serv.*, 118 F.3d 60, 64 (2d Cir. 1997). "If a comparison with another employee is to lead to an inference of discrimination it is necessary that the employee be similarly situated in all material respects." *Johnson v. Long Island Univ.*, 58 F. Supp. 3d 211, 224 (E.D.N.Y. 2014) (internal quotation marks omitted).

> What constitutes 'all material respects' . . . must be judged based on (1) whether the plaintiff and those [she] maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness . . . . Hence the standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than showing that both cases are identical.

*Graham*, 230 F.3d at 40 (citations omitted).

Here, Plaintiff identifies three white bus drivers whom she claims were treated more favorably than she was when they were disciplined for similar employee misconduct. However, Plaintiff offers no evidence, other than her own recollection of hearsay, in support of the alleged conduct and discipline of these other drivers, which she claims prove her disparate treatment. Defendant argues that this is insufficient to prove disparate treatment. (Dkt. No. 51, Attach. 37, at 17.) The Court agrees, and is persuaded by case law cited by Defendant in its memorandum of law. *See Ya-Chen Chen,* 805 F.3d 59 at 73 (affirming grant of summary judgment in favor of defendant where plaintiff teacher "presented no evidence of how [employer] treated [other teachers] who were subject to comparable allegations of inappropriate conduct with a student").

Further, even if the Court were to accept Plaintiff's allegations for proving disparate treatment, the Court would agree with Defendant's argument that none of Plaintiff's comparators engaged in the same type of conduct as Plaintiff. Here, each alleged comparator was reprimanded by Defendant for child safety violations, and they each were given an opportunity to improve rather than be terminated. Plaintiff was terminated after Defendant considered the following three factors: (1) Plaintiff violated Defendant's Confidentiality Policy, which was a separate violation that is subject to different standards than a child safety violation; (2) Plaintiff's confidentiality violation led to a parental complaint; and (3) the parental complaint caused SCSD

to remove Plaintiff from all of its routes. There is no evidence in the record establishing that any of these factors occurred in the comparators' situations, and Plaintiff did not even allege otherwise. Thus, based on the standard previously stated, the alleged comparators cannot be considered similarly situated in all material respects.

The Court also agrees with Defendant's claim that Plaintiff has not proven that she was treated less favorably than a similarly situated employee who is outside of Plaintiff's protected class. There is no evidence in the record of another First Student bus driver, of any race, who avoided termination after having violated the Confidentiality Policy in such a way that prompted a parental complaint, while also being removed by SCSD from all of its routes. Additionally, before the occurrence of the Confidentiality Policy violation that resulted in her termination, Plaintiff had two prior child safety violations,[7] which the Court believes reasonably resembled the situations of the alleged comparators much more closely than her Confidentiality Policy violation did. As stated above, each alleged comparator engaged in conduct that was considered a child safety violation, and was given an opportunity to improve rather than be terminated for these violations. Similarly, Defendant granted Plaintiff an opportunity to improve after both of her child safety violations, rather than terminate her for them. (Dkt. No. 51, Attach. 9 [Plf.'s Depo. Tr.].) Therefore, the Court does not find that Plaintiff was treated less favorably than similarly situated employees outside of her protected class.

For all of these reasons, the Court finds that Plaintiff failed to create a genuine issue of material fact with regard to the fourth element of the first step in the *McDonnell Douglas* burden shifting approach to her Title VII claim.

---

[7]        (Dkt. No. 51, Attach. 12-13.)

## B. Whether, in Any Event, Defendant Produced Legitimate, Non-Discriminatory Reasons for Its Decision to Terminate Plaintiff's Employment

Because the Court found that Plaintiff did not meet her initial burden in the *McDonnell Douglas* test, the Court need not reach step two of the *McDonnell Douglas* test. However, in the alternative, the Court finds that, after carefully considering the matter, Defendant produced legitimate, non-discriminatory reasons for its decision to terminate Plaintiff's employment, for the reasons stated by Defendant in its memorandum of law. *See*, *supra*, Part I.C. of this Decision and Order. To those reasons, the Court adds the following analysis.

Here, Defendant offers multiple legitimate, non-discriminatory business reasons for terminating Plaintiff, and provides evidence in the record to support that these reasons existed. (Dkt. No. 51, Attach. 2-15.) The Court finds the legal arguments in support of these reasons as legitimate and non-discriminatory to be facially meritorious.

First, Defendant argues that employee misconduct or poor judgment with a student/parent constitutes a legitimate, non-discriminatory reason for termination. (Dkt. No. 51, Attach. 37, at 21.)[8] Second, Defendant argues that an employee violation of company policy constitutes a legitimate, non-discriminatory reason for termination. (Dkt. No. 51, Attach. 37, at 21.)[9] Finally,

---

[8]  *See Woods v. Newburgh Enlarged City Sch. Dist.*, 288 F. App'x 757 (2d. Cir. 2008) (finding that an employer's determination that employee exercised poor judgment with student's confidential information in violation of FERPA establishes legitimate, non-discriminatory reason for termination); *Stein v. Churchville-Chili Cent. Sch. Dist.*, 760 F. Supp. 2d 308 (W.D.N.Y. 2011) (finding that a school district had a legitimate, non-discriminatory reason to terminate bus driver for bad judgment resulting in parental complaints).

[9]  *See Daniel*, 2015 WL 2114158, at *3 (citing *Giudice v. Red Robin Int'l, Inc.*, 555 F. App'x 67, 69 [2d Cir. 2014]); *Shumway*, 118 F.3d at 65; *Pealo v. AAF McQuay, Inc.*, 140 F.

Defendant argues that Plaintiff's termination due to customer dissatisfaction is a legitimate, non-discriminatory reason. (Dkt. 51, Attach. 37, at 22.)[10] The Court agrees and finds as undisputed the facts that demonstrate the basis for termination (i.e., Plaintiff's conduct violated company policies, prompted parental complaints, and resulted in client dissatisfaction).

For these reasons, the Court finds that, even if Plaintiff has created a genuine issue of material fact with regard to the fourth element of the first step of the *McDonnell Douglas* approach, Defendant met its burden of production by offering multiple legitimate, non-discriminatory business reasons for terminating Plaintiff. Accordingly, the burden then shifts back to Plaintiff to prove that these reasons were a pretext for discrimination.

### C. Whether Plaintiff Has Offered Evidence of Pretext

After carefully considering the matter, the Court answers this question in the negative for the reasons stated by Defendant in its memorandum of law. *See*, *supra*, Part I.C. of this Decision and Order. To those reasons, the Court adds the following analysis.

Here, Plaintiff admits to have engaged in the conduct that Defendant offered as the reason for her termination, admits that the conduct is a violation of the Confidentiality Policy, and does not dispute that SCSD had her removed from its bus routes. (Dkt. No. 51, Attach. 9 [Plaintiff's Deposition at 105:2-5, 53:16-55:3, 155:16-156:15].) These admissions alone prevent Plaintiff from establishing that the reason for termination was false. Plaintiff cannot establish

---

Supp. 2d 233, 239-40 (N.D.N.Y. 2001) (Munson, J.) (finding that violation of a company's harassment policy constituted a legitimate, non-discriminatory basis for termination).

[10]     *See Joseph v. Owens & Minor Distrib., Inc.*, 5 F. Supp. 3d 295, 312-313, 322 (E.D.N.Y. 2014) (finding that a important customer's dissatisfaction and request that plaintiff not work on its account was a nondiscriminatory reason for employer's decision to terminate plaintiff's employment because "[c]ustomer complaints have been recognized as a legitimate and nondiscriminatory reason to terminate an employee"), *aff'd*, 594 F. App'x 29 [2d Cir. 2015]).

that her employer's offered reason was false where she admits to the conduct that has been established as the legitimate, non-discriminatory reason for her termination.

Further, Plaintiff offers no evidence of a similarly situated employee outside of her protected class who was treated more favorably than she. Plaintiff has also failed to offer any evidence of discrimination by her employer, other than a claim of a single discriminatory comment that was not made towards her, which was substantiated only by hearsay. (Dkt. No. 51, Attach. 9 at 192:8-10.) Plaintiff herself never heard a discriminatory comment in the workplace at First Student. (*Id.* at 192:11-20.) In fact, Plaintiff described her time working for Defendant as "the best job [she] ever had." (*Id.* at 30:16-31:4.) Further, she admits that she believes she was treated fairly by Defendant before her termination. (*Id.* at 31:21-23, 75:9-15.) Without evidence of any discrimination by Defendant as an employer, Plaintiff's claim of discrimination is nothing more than unsupported speculation.

Unsupported speculation is simply insufficient to defeat Defendant's motion for summary judgment on Plaintiff's discrimination claim. *Daniel*, 2015 WL 2114158, at *3 (citing *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 [2d Cir. 2000] (finding that a plaintiff must rebut evidence of legitimate, nondiscriminatory reasons for dismissal with specific evidence tending to show not only that those reasons were a pretext, but that unlawful discrimination was the real reason for the employment decision). It is well settled that "'conclusory allegations or unsubstantiated speculation' [are in]sufficient to raise a triable issue of fact as to whether . . . discriminatory animus" played a role in an adverse employment action. *Daniel*, 2015 WL 2114158, at *3 (quoting *DiGirolamo v. MetLife Grp., Inc.*, 494 F. App'x 120, 122 [2d Cir. 2012]); *see also Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 561 (2d Cir.1997) (finding "purely

speculative" assertions of discriminatory animus insufficient to defeat summary judgment). The Court also notes "that it has no duty to *sua sponte* sift through the record on a summary judgment motion in search of a factual dispute." *Kidkarndee v. Koenigsmann*, 12-CV-0502, 2014 WL 1239319, at *5 (N.D.N.Y. Mar. 25, 2014) (Suddaby, J).

For all of these reasons, the Court finds that Plaintiff did not offer sufficient evidence to create a genuine issue of material fact regarding whether the legitimate business reasons offered by Defendant were a pretext for discrimination.

**ACCORDINGLY**, it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 51) is **<u>GRANTED</u>**; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **<u>DISMISSED</u>**; and it is further

**ORDERED** that the Clerk of the Court shall close this action.

Dated:      August 7, 2018
           Syracuse, NY

Hon. Glenn T. Suddaby
Chief U.S. District Judge